The 4th District Appellate Court of the State of Illinois has now convened. The Honorable John W. Turner presiding. Thank you. Good morning. We're here on case number 4-2-3-0-1-6-5. That's Urso v. Bradley University. Appearing for the appellate is Joel Handler and appearing for the appellee is William Kohlhase. Mr. Handler, are you ready to proceed? I am ready. Is it okay if I sit or do you want me to stand? No, you're fine. Okay, thank you. Okay, thank you. May it please the court. Again, my name is Joel Handler. I represent the Plaintiff Appellant, Natalie Urso. Your Honors, the summary judgment that was entered by the 10th Judicial Circuit on January 25, 2023 should be reversed. You have a situation here that the parties pretty much agree on the controlling rules of law governing a situation involving a cause of action brought by a student against a private university, in this case, Bradley, for breach of contract. Those rules are stated. I'll just briefly cover them, cover a couple of them with you, and that's one rule of being a contract between a private institution and a student confers duties upon both parties, which cannot be arbitrarily disregarded and may be judicially enforced. That's the DeMarco decision that we cited. That's 4-40-0-3, 4-74-4-80, 3-52-0-2, 3-56-361-362-1976. Illinois courts have held that students have a cause of action sounding in breach of contract where the private school makes an arbitrary and capricious adverse academic decision in the school's treatment of a student, including dismissal. That is the Cartridge v. Loyola University, Chicago decision, 4-09-0-F-3, 76-82, 9-84-N-2, 2-19-226-2007, quoting from the Harris v. Adler decision. To state a claim for breach of contract, a student must point to an identifiable contract promise that the defendant failed to honor, and that's Ross v. Creighton University, 9-57-F-2, 4-10-4-17, 7th Circuit, 1992. Mr. Handler, good morning. Sorry to interrupt you, but I had a question that goes beyond some of the general legal principles you were just sharing with us. The crux of this case seems to be the definition of an unsafe practice, and that is defined in Bradley's undergraduate nursing handbook, and it also tells us, the handbook also tells us, that whether a student engages in an unsafe practice can affect a student's grade. Would you agree with that, that that's the handbook? I would agree that the handbook delineates the three situations which would constitute an unsafe practice, none of which is applicable here. Well, but doesn't Bradley's determination that Erso engaged in an unsafe practice actually constitute an unreviewable academic decision? In other words, this court cannot review academic decisions. Right, but I'm saying... This is like Frederick. Okay, go ahead. And it differs from Frederick in the context that you can review this in light of what of the fact situation here. It's not a situation that it was a, you know, strictly, you know, I mean, she got, she was removed from the program, from the nursing program, by virtue of it. Okay, but did she engage in that unsafe practice that would, as what you're saying, Judge, would basically, you know, knock her out without an ability to challenge? And I'm saying no, she does have the right to challenge, because even in an academic standpoint, and the cases hold that, if the decision that the Bradley makes is arbitrary, capricious, and in bad faith, it's still, it's still, it is subject to a breach of contract action, which included her dismissal from the program. So how is this arbitrary and capricious? Well, I will address that right now. First, let's deal with does, did her conduct, in that she, you know, did, namely, she asked the nurse who was on her first day at the hospital there, who took, you know, she was supposed to take the vital signs. No question, Natalie Erso was the one who was supposed to do the vital signs. First day, you have this Holly Phillips there, and Holly Phillips took the vital signs, and Holly Phillips said it was okay for her to put down those vital signs, because Natalie came in shortly thereafter. So she puts them down. So was that an unsafe practice? We say it wasn't. It wasn't an unsafe practice. In fact, you know, in looking at the, well, at the transcript of the hearing, you have an acknowledgement made by the court, the 10th Judicial Circuit, that Bradley didn't follow its procedures here, clearly didn't follow its procedures. So what I'm saying is, one, it didn't engage, Natalie Erso did not engage in an unsafe practice. One, she didn't pose a threat by putting down those vital signs. It did not pose a threat to that patient. There was no evidence that was elicited about that judge. And I'll just interject, you know, the definition includes the potential for a threat. I'm going to get to that. That's what I was going to get to next, Judge. Okay. Go ahead. All right. And I dealt with that in the reply memo that we filed, okay? So because that was raised by Mr. Kohlhase, okay? And first, how does the charting of vital signs, 21 minutes after they were taken, potentially, how did it potentially harm this patient? It didn't at all. Remember that the vital signs merely insist of one's blood pressure, pulse, heart rate, and oxygen level. That's it. That's all it does when, you know, Natalie Erso would be taking that. There was no controversy by Bradley that in the room at the hospital, a cardiac patient would be hooked up to various machines. And we're all, you know, cognizant of that, you know, in terms of, you know, what's in a hospital room for a cardiac patient. So there was no evidence introduced by Bradley of any potential harm by virtue of Erso recording these vital signs. There was nothing in the vital signs, Judge, that were taken that indicated that this patient was in some type of distress, and therefore, it had to be monitored more frequently than what they did. So are you suggesting, counsel, that we look at this instead of with the definition in the handbook in a real world, with real world criteria, and that this court reviews that, as opposed to saying, well, the definition is in the handbook. We as a court cannot review academic decisions because the definition was tied to the grade, which was a failing grade, and the university made the decision that she could not continue in the program. Well, what I'm saying to you is that in reaching a decision, you have to go on what the evidence was, okay, or what the evidence wasn't introduced. Here, there was no evidence whatsoever that this patient was potentially in danger by virtue of the recording of the vital signs. And what you have here, and I understand where you're going, Judge, in terms of, you know, what your question, I'm not trying to beg your question, but what I'm saying to you is that you have to look at and we do have to incorporate our own experiences, you know, as well as what the record shows us. So you have a situation where Natalie Erso is being dismissed from this program, being dismissed from the nursing program because of this, of what a nurse told her to do. And there's no controversy on that. It's not being contested by Bradley. Oh, she was dismissed because she had a failing grade. Oh, but here's the thing, Judge. If, would she have gotten the failing grade by virtue of the, if she didn't engage in the conduct? The answer is no. She was passing the course at the time. There was no question on that. She was passing that course. They failed her because they said that you went ahead and you engage in an unsafe practice. So that's why this is reviewable, Judge. It's just not, you know, it's very, you know, very coy that the Bradley to argue that, oh, well, you can't, you can't even consider this appellate court because it's a pure academic decision. No, it is not a pure academic decision because it's. Go ahead. I'm sorry. I didn't mean to interrupt. Go ahead and finish the, I wanted to finish the because. Okay. Because if she did not, or if they determined that, okay, Natalie, don't do it again. If they would have just said, Hey, listen, don't do it again. Or we're going to suspend you for this period. She wouldn't have failed the course judge at all. She was passing that course. So that's why I'm saying that it's arbitrary, capricious, and in bad faith. And here's another thing with regard to the issue of, you know, you have the, you have the, the 10th circuit acknowledging clearly, and that's on page of the opinion. It was on page 20 of his opinion where, where the judge said, there's no dispute that the defendant failed to strictly comply with the letter of its own policies. Okay. And that was dealing in terms of, you know, that we addressed the recording, whether, you know, Natalie, whether the provost was supposed to state his reasons, whether the decision of the two deans was timely made, didn't do it. But then he held, I didn't find that there was, this was done in bad faith. The appellate, the 10th judicial circuit does not give us any insight whatsoever. As far as why he made that fine. Why is that important? It's important because the cases in Illinois have clearly held. If a party to a case has engaged in bad faith, that is a question of fact for a jury to decide. And I can give you three decisions right now that I, if you want to take them down, that's fine. I can, I just read them off to you right now where they hold this and they hold it in a myriad of different contexts. One being Swedish American Hospital Association of Rockford versus the Illinois State Medical Interinsurance Exchange, 395 Illhab 3rd 80, 916 Northeast 2nd 80. It's a 2009 decision. You have the decision in Coffey versus Quinn, same, same ruling, 578 Fed Sub 1464. It's the Northern District of Illinois decision of 1983. And you also have a case of Schwach, S-C-H-A-W-K v. Donruss Trading Cards, 319 Illhab 3rd 640. The Northeast site is 746 Northeast 2nd 18, 2001 opinion. So you have a situation where this judge went ahead. He found that he concluded that there was bad faith. There was no bad faith. Clearly weighed the evidence, which that it was impermissible here. It's a fact thing, especially in light of the, of him finding, finding that we presented evidence that clearly showed that Bradley did not comply with its own handbook and the requirements of its own handbooks and the provisions. So that's why judge, when you go in and you look at everything that Bradley did from the beginning, this was a, a, a simple situation of a nursing student following the, the order of a nurse who was there on her first day. And maybe, you know, that was okay for, for that nurse at a different hospital, you know, the hospital where she previously came from. And she did it and she followed that. But then she is, she is knocked out of the program for doing that at a time when she wasn't failing that course. And therefore, therefore that's why it is reviewable by, by this court. Well, she had failed another course a couple years or some other at some other point prior to that, had the opportunity to make up the failing grade, bring it from a D to a C. So there's only one opportunity to do that. She also was failing the pharmacology course at the same time she was taking the clinical rotation that's of this case. So there were other factors that I believe were part of the decision. Well, but that's not, no, that's not. To allow her, to allow her, I'm sorry, to continue or not with respect to the program. I meant the judge. I'm sorry. No, no. Yes. Correct. But, but, but there was the testimony that was made that if a, you know, that Bradley did make exceptions, if a party was failing two courses at one time in one semester, that that would be okay. But you see here, you have a situation where, you know, again, she wasn't failing three, you know, the, the course in question and therefore, you know, there's, you know, there's nothing that would prevent Natalie from continuing on in the program. Well, the type of exceptions that usually are, that I believe we found in this case were exceptions for illness or a family situation. None of those seem to be in the record here with respect to the university making exceptions. Judge, there's no, nothing in the handbook that says that is limited to those situations at all. And, and we had the testimony that we get when we took the depositions and they acknowledged that, that it wasn't limited to just those situations. So you have a situation where Natalie was proceeding with this course. She was told to do something by the nurse and the testimony was also, Judge, is that when a nursing student gets an order from a nurse, she is obligated to follow that, that, that order. And she did. So now she's being, being penalized for doing this and gets kicked out of the program. That's why we're saying, when you look at all the things and also taking consideration, the attitude that Wallenfang and Brubacher had toward her, that you, it was clear cut that Bradley did engage in conduct that was arbitrary, capricious, and in bad faith. This judge, the 10th Judicial Circuit had no right to go ahead and take the case away from the jury by saying, okay, I just find that there's no bad faith. Yes, I find that you violated everything, you know, that you didn't follow your procedures, you breached the contract, but I don't find bad faith. I don't see how you can, he, he should have made that decision in the first place because it's not within his province. But secondly, because he can't weigh the evidence. Secondly, there is no evidence that, that there was, there was not bad faith. There was bad faith here. Well, counsel, I've been listening intently. I've reviewed the briefs and it seems to me that the administration, and I'm not, please don't parse my words, but the body to make the decision had a decision to make and the decision, all the information was taken and they made a decision. One decision could have been to allow her to continue in the program. However, most cases it was for illness and other things. The other decision was termination. I guess what I'm looking for is some type of nexus to say there was some type of capricious act or bad faith. It sounds like what you have is a lack of following the regulations of the handbook and, or some type of proof that the patient was potentially in danger because of this act. So those are the two things. I mean, what do you have? They made a decision, they made a decision, and it's not the decision that they may have made to keep her in with a suspension, but they made a decision. So where's the bad faith? Bad faith is when you take in consideration the individuals who made the decision, who partook, judge. You have the first one being Wallenfang because that's the steps, and both sides in their briefs delineated the steps for you. And so Wallenfang, there's animus, clear animus that she had toward my client, all right? Brubaker also had it. So she comes in, and Wallenfang is the one who made the first decision. You know, it's almost like when, you know, you're like a union employee and you have a, you know, a grievance that you want to bring and, you know, how you go through the various steps. Well, she went through the and you have a situation where here it is with Wallenfang and Brubaker having this animus toward her. Well, let me stop you because we won't have so much time. Animus, I mean, we've got, these are administrators, professors, there's concern about the academic achievement. How does that rise to the level of animus, capricious? When I have someone testifying a deposition, calling my client a liar, all right? And, you know, and not acknowledging and not requesting, you know, as an administrator, you have a person who says, I'm requesting to meet with you to go over things, what have you. You refuse because she brought her mother with her. You refuse the meeting. You know, judge, there's more to it. No, no, no, no. I understand. But the liar, let's just break these down. The liar comment wasn't sort of a generalized, this person is a liar in most contexts. There was a reason for that statement, I believe. And that was something that was stated on email or somewhere that seemed to be incorrect by the administration. Isn't that right? I think for an administrator to come flat out and make those kind of comments just showed her true colors here in this case. And there was resentment, you know, and that when you read in, especially in Wollofang, she felt that my client had slandered her and, you know, I don't know if you have anything outside of the process of reviewing the situation, because that's, you know, at that point, there's confrontation. This is a procedure to basically expel or uphold a decision. So, of course, there's going to be one's positions stated. And, you know, this isn't as though these statements were made while she was merely a student and there weren't these adversarial proceedings going on. Do you have anything prior to the adversarial proceedings that was? Well, I think that this was, I think we did when we cited in our brief that there were problems that she had with, that Natalie had with Brubaker and Wollofang before. And was that associated with the first failure? No, it was not associated with the first failure, but it's just in terms of dealing with them. In fact, when Natalie first made a request for Wollofang to meet with her, she pulled out. She canceled the meeting and that's when Wollofang nevertheless said, no, we're going forward with this meeting. And that's when she was told you're out. Okay. So, I think that there is more that, you know, that this attitude that Wollofang, Brubaker had toward Natalie existed well before this incident occurred. Mr. Handler, you are away because you're allotted time. So, you will have rebuttal. Mr. Holt, would you proceed with your argument now? Thank you. May it please the court. The real question as the court has focused on is not whether there was a correct decision, but was there an academic decision made by the institution? In this situation, in the practicum course at the hospital, an unsatisfactory grade was awarded based on what the instructor determined was unsafe practice. I'm not going to go through the details of the record there in our brief very clearly, but what you have is an admission that the plaintiff entered vital signs in the electronic medical record reflecting them being taken at a time when they were not actually taken. The instructor determined that under the standards of the Bradley University nursing department, that was an unsafe practice. That's the initial academic decision. That decision was then upheld after the department chair pointed out that the plaintiff had received instruction in prior courses regarding charting, what's to be put in the chart, and what's not to be put into the chart, the need for you to actually do the work yourself. That was then reviewed by the dean, and the dean upheld that decision, and it went to the student grievance committee, which determined that what happened was consistent with prior determinations in the nursing department, and that while they were sympathetic to the plaintiff, the grade had to be upheld. They realized the negative consequences, but as has been pointed out, those negative consequences resulted from other academic performance. It was not a decision that you engage in unsafe practice, therefore you cannot continue in the nursing program. It was a decision that what you did in charting vitals that you didn't take at a time when they were not taken was an unsafe practice, therefore your grade is going to be unsatisfactory. It could have been a different outcome, but that's a discretionary call, and the results... Interrupting you. It's hard, obviously, when we're on video to find the right moment, so I apologize for interrupting in the middle of a sentence, but opposing counsel seem to indicate that this court should be looking at, quote, the facts of this case, not necessarily the definition, or to see if they met the definition in the handbook, or possibly suggesting that maybe in a real hospital setting, this might not have been an unsafe practice. So, is that the role of this court in reviewing the trial court's decision with regard to the summary judgment motions? No, not at all. The role of the court in this context, as many, many decisions have indicated, is to determine was there, in fact, an academic decision made. If there was, it should be deferred to, period. That's the law. And how was this an academic decision? Because once the student did what she did, there's a question, okay, was that an unsafe practice to chart something that you didn't read, you didn't take those vitals, and you put them in the electronic medical record at the hospital for a live patient at a time other than when those vitals were taken? Is that unsafe? That's a judgment for nursing faculty. That's not a legal judgment, Your Honor. And this was certainly not, however, it wasn't an academic course, per se. It was a clinical course, but a course nevertheless. Yes, absolutely. It was. It was a required course. And in addition, to jump ahead a little bit, as you pointed out, in the pharmacology course, NUR 318, the plaintiff also got less than a C. That was another required course with an exam. And that also would bar her from continuing as a nursing major. She wasn't expelled from Bradley. She just couldn't continue as a nursing major. Certainly, that was her desire. But the academic standards of the program have to be met in order to stay in the program. She didn't meet the standards. That's why she was not allowed to continue, period. But a posting counsel also pointed out that the university chose not to afford her the exceptional circumstances or to make an exception for her, as they did perhaps for other students. How do we look at that? Number one, she never requested an exception. Number two, the exception is not something that is a formal part of the nursing department student handbook. It's something that the faculty have done, as the testimony showed over the years, based on a vote of all the faculty in the department, based on the circumstances of a particular student, in the same semester, under circumstances, as the court has pointed out, where the student had a family emergency, there was an illness, there was something like that. There's nothing in the record to support the application of any exception here, starting with the fact that no exception was requested. In the review process by the various deans and committees, the timelines in the handbook weren't always adhered to. Does that render the actions of the university arbitrary and capricious? No, the Illinois law is clear on the point that if there is a procedural misstep by the institution in connection with a process as occurred here, that does not per se render a decision arbitrary and capricious. Period. You look at the whole picture, was it a decision, as has been pointed out, again, there was a process, the process was followed. I understand the procedural quibbles, and I don't want to spend time on that here, they are minor at best, and we dispute those, but it really doesn't matter, because the law is clear that that by itself does not create an arbitrary and capricious decision. The real bottom line issue is, was there an academic judgment made? That is what happened based on the standards that the faculty apply as experts in nursing education. That is what happened here. The opposing counsel mentioned at the very end of his argument the point that there appeared to be animus on the part of the faculty towards Ms. Urso, and that affected their decision and contributed to it being arbitrary and capricious. Do you want to speak to the animus that apparently is reflected in some of the deposition testimony that was submitted to the court as part of the motion for summary judgment? We dispute that there is any predispute animus reflected in the record. There is nothing unrelated to the academic decision at issue here. There was a lot of emotion once this happened, and the plaintiff and her family were very firm in their resolve that she should not be excluded from the program, should not have gotten an unsatisfactory grade. There was some emotion after that, but there was no pre-academic decision animus, period. It is not in the record anywhere. That is our position, and the record supports it. Thank you. So, in terms of the basic proposition here, I think that the argument that Bradley was wrong really demonstrates that there was a decision, and therefore, it should be deferred to. With respect to, this is a minor point, but I want to make it clear that anyway, with respect to these procedural glitches that they perceive and that we dispute, there is not any indication anywhere in anything that the plaintiff ever filed that the dean, if they were three days late because the parent and child met with both the faculty department chair and the dean on the same day, and they both have a timeline going forward, they argue there should have been a transcript of the grievance committee hearing. They can't point to anything that requires that. They say, well, there's nothing that says you can't do it, and then they complain about the provost not articulating his reasons for agreeing with the grievance committee. There is nothing that the plaintiff advances to the effect that any of the glitches that somehow she was damaged. Was the dean being three days late the cause of a different outcome? You can ask the same thing about the transcript or what the provost did. There's just nothing in the record to support if those were breaches, which we dispute that there was any resulting damage, and therefore, there is no breach of contract claim that can be based on those. But to return to the proper focus, this was an academic decision. The court should defer to it. That's our argument. I'd be happy to answer more questions. Otherwise, I'm finished. Mr. Polohase, I have one question. It appears that Deborah Daniels in her deposition thought that the entry was made 40 minutes after the vitals were taken rather than 21. Does that make any difference? No. The record supports the understanding of the nursing faculty that vitals can change at any time. Whether it's 20 minutes or 40 minutes, it doesn't matter. It was an entry in the record that was not accurate, period. If the plaintiff had entered the vitals at 10.16, it had indicated that they had actually been taken at 9.55 a.m. and that they were taken by a different nurse or the registered nurse, would we be here today? I can only speculate and say perhaps not, because the record would have been clear. This is an electronic record in a system at a hospital. Everybody is relying on it. I was going to say paper trail, but electronic trail that said, okay, this is what I'm doing and explain what it was. Anyone looking at it would not say, here's what happened at 10.55 or 10.16 or whatever. That may well have led the instructor to reach a different conclusion, but that, of course, is not what happened. Okay. I don't see any other questions. Mr. Handler, do you have any rebuttal? I do. Thank you, Judge. First, with regard that Mr. Colhase is mentioning about a purely academic decision, I again refer the court to the Zipes v. Partridge decision, which Mr. Colhase does cite in his brief, where for the rule of law that Illinois courts have held that students have a cause of action, sounding a breach of contract where a private school makes an arbitrary and capricious adverse academic decision in the school's treatment of a student, including dismissal of the student. And so that Zipes v. Partridge v. Loyola, 409 Illhab 3rd, 7682, 984 Northeast 2nd, 219, 226, 2007. This is an adverse academic decision that was made here. So it's not a situation that, you know, Mr. Colhase is giving the proposition, oh, well, because it's an academic decision, you just have to, you know, you can't touch it. You can't touch it. No, that's not what the Zipes case said, which he recited in his own brief. You have, you know, the thing about being arbitrary and capricious here and about these various things, these steps that we were talking about. One, the Bradley, in the summary judgment briefing, did not contest that these steps were not followed. They did in the argument section, but not in terms of the statement of facts. In fact, Mr. Colhase filed a response admitting to the deposition testimony that I cited in support of our motion for summary judgment. You have a situation that these steps had to be followed. If they didn't have to be followed, why were they placed in the handbook? Why were they placed in the handbook? So, I mean, they can go ahead and disregard, and this is what, you know, you see, the educational institution says, student, you have to follow these rules, but we don't have to follow them. That's not what the testimony was. Judge, I'll be with you in one second. I'm sorry. Okay, I apologize. All the individuals that I deposed from Bradley said that they had to follow those rules, all right? And therefore, they can't go ahead now and say, well, it was minor or what have you. It wasn't minor. If it was so minor, why did you have this, you know, four-step process that my client had to follow? It wasn't minor. She followed it to a tee. They didn't follow it to the tee. The circuit court acknowledged that they didn't follow it. So, the thing is, and this gets back to Judge Zenoff's claim about, you know, and, you know, what we discussed earlier on, was that bad faith? It was bad faith when you take into consideration all the facts that went on here. When you have a provost... But, counsel, these were recommended guidelines, correct? So, that means... No, Judge, they said that, they all said that they were mandatory. The timelines? They said that they had to follow... In the student grievance procedure? They had to follow. Well, I'll take another look then. No, I really, I hope... I looked at them. I saw them as recommended guidelines. They weren't recommendations, Judge. They were mandatory. They were mandatory. Responding to opposing counsel's point, how was your client prejudiced by, let's say, the three-day late decision? When you look at it in mass, what happened to her? She got kicked out of the program, right? She was unable for two years to become... You know, she was in her graduating year. She was unable to be a nurse for two years by virtue of this. She had no... She couldn't go forward. Here's the thing. You have this process. The process is not followed. You're then told you're out of the program. You can stay and be a Bradley student if you want, but you're out. You can't be a nurse. So, she pays tuition for the nursing program and is out of that program. So, she's out all the money that she paid to become what she wanted to be for her life profession. So, because there wasn't adherence to... First of all, there wasn't an unsafe practice, okay? So, therefore, this should never have even happened. So, she has been... When you take it all together, Judge, and you look at this, one, she didn't engage in an unsafe practice. Two, the steps that they followed weren't followed, which were mandatory to be followed. She's damaged because the end result is that she is deprived of her profession. So, that's how she is. Justice, has Mr. Handler answered your question? Yes. Okay. That being the case, Mr. Handler, you are out of time. We thank both of you for your arguments. The case is submitted and the court will stand in recess until 11 a.m.